AO 106 (Rev. 04/010) Application for Search Warrant          AUTHORIZED AND APPROVED/DATE:    /S Bow Bottomly 12/8/2023

# UNITED STATES DISTRICT COURT
for the

WESTERN                    DISTRICT OF                    OKLAHOMA

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be search* | ) |
| *Or identify the person by name and address)* | ) |
| PROPERTY KNOWN AS: | ) |
| One (1) Samsung, black in color, mobile phone with | ) |
| IMEI 3543564016320525 on the back of phone | ) |
| | ) |
| IN POSSESSION OF: | ) |
| Kay County Detention Center | ) |
| 1101 W Dry Rd. | ) |
| Newkirk, OK 74647 | ) |

Case No: M-23- 1000- SM

## APPLICATION FOR SEARCH WARRANT

I, Timothy C. Doyle, a federal law enforcement officer or attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following property *(identify the person or describe property to be searched and give its location)*:

See Attachment A, which is attached and incorporated by reference.

Located in the Western District of Oklahoma, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, which is attached and incorporated by reference.

The basis for the search under Fed. R. Crim.P.41(c) is *(check one or more)*:

☒    evidence of the crime;
☒    contraband, fruits of crime, or other items illegally possessed;
☒    property designed for use, intended for use, or used in committing a crime;
☐    a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. §§ 113(a)(3) and 1153 | Assault with a Dangerous Weapon |
| 18 U.S.C. §§ 113(a)(6) and 1153 | Assault Resulting in Serious Bodily Injury |
| 18 U.S.C. §§ 113(a)(7) and  1153 | Assault Resulting in Substantial Bodily Injury to an intimate partner or dating partner |
| 18 U.S.C. §§ 1201(a)(2) and 1153 | Kidnapping |
| 18 U.S.C. § 922(g)(1) | Felon in Possession of a Firearm |

The application is based on these facts:

See attached Affidavit of Special Agent Timothy C. Doyle, Federal Bureau of Investigation (FBI), which is incorporated by reference herein.

☒    Continued on the attached sheet(s).
☐    Delayed notice of _____ days *(give exact ending date if more than 30 days)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet(s).

_Applicant's signature_

Timothy C. Doyle
Special Agent
FBI

Sworn to before me and signed in my presence.

Date: 12/8/23

City and State: Oklahoma City, Oklahoma

_Judge's signature_

SUZANNE MITCHELL, U.S. Magistrate Judge
_Printed name and title_

# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Timothy Curtis Doyle, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant to search for and seize evidence of violations of Assault and Battery with a Dangerous Weapon, in violation of 18 U.S.C. §§ 113(a)(3) and 1153(a), Assault Resulting in Serious Bodily Injury, in violation of 18 U.S.C. §§ 113(a)(6) and 1153(a), Assault of a Spouse, Intimate Partner, or Dating Partner Resulting in Substantial Bodily Injury, in violation of 18 U.S.C. §§ 113(a)(7) and 1153(a); Kidnapping, a violation of 18 U.S.C. §§ 1201(a) and 1153(a); and Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1) located within one (1) Samsung, black in color, mobile phone with IMEI 354356401632052 on the back of the phone. The device to be searched is described in the following paragraphs and in Attachment A.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since approximately September 2015.  I am currently assigned to the FBI's Oklahoma City Field Office, Stillwater Resident Agency.  As part of my duties as an FBI Special Agent, I investigate federal criminal violations, to include interstate transportation of stolen property.  As a result of my training and experience, including information provided by other federal agents with applicable knowledge, I am familiar with the tactics, methods, and techniques used by criminals in cases such as this.  As part of my job, I have conducted numerous investigations involving the use of the internet, smart phones, email, and social media to further

criminal activity. I have participated in the execution of multiple federal search warrants involving various types of evidence and property.

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from my review of local law enforcement reports and interviews of witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

4.     Based on my training and experience, evidence of criminal activity, to include motives, operational planning, operational preparation, and other relevant evidence will be found in the criminal's electronic devices including their cellular telephone. This evidence often includes location data stored in the internal memory of the cellular telephone, encrypted communications between co-conspirators, non-encrypted communications between co-conspirators in the form of emails and text messages, and other accounts linked to the criminal and their criminal activity to include social media accounts which can be used in the planning and execution of a crime.

5.     Based on the information set forth below, there is probable cause to believe that within one (1) Samsung, black in color, mobile phone with IMEI 354356401632052 on the back of the phone, inside of a gray and lime green case, currently in inmate Justin Randall Brown's property bag in the possession of the Kay County Detention Center located at 1101 W Dry Rd., Newkirk, Oklahoma, 74647, and hereinafter referred to as "the DEVICE", and any and all evidence referenced in Attachment B, is related to violations of Assault and Battery with a Dangerous Weapon, in violation of 18 U.S.C. §§ 113(a)(3) and 1153(a), Assault Resulting in Serious Bodily Injury, in violation of 18 U.S.C. §§ 113(a)(6) and 1153(a), Assault of a Spouse, Intimate Partner, or Dating Partner Resulting in Substantial Bodily Injury, in violation of 18 U.S.C. §§ 113(a)(7) and 1153(a); Kidnapping, a violation of 18 U.S.C. §§ 1201(a) and 1153(a); and Felon in Possession

2

of a Firearm, in violation of 18 U.S.C. § 922(g)(1). There is probable cause to believe that a seizure and search of the DEVICE will lead to evidence, fruits, and instrumentalities of the aforementioned crimes.

6.      This court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. §§ 2711, 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is "a district court of the United States. . . that has jurisdiction over the offense being investigated." 18 U.S.C. §2711(3)(A)(i), and "is in . . . a district in which the provider . . . is located or in which the wire or electronic communication, records, or other information are stored." 18 U.S.C. §2711(3)(A)(ii).

## TECHNICAL TERMS

7.      Based on my training and experience, I use the following technical terms to convey the following meanings:

a.   Wireless telephone:   A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.   These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.   A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments,

3

and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

c. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

## PROBABLE CAUSE

8.      On October 27, 2023, Stillwater Police Detective David Adney (Det. Adney) was on call when he was advised a female had shown up in the emergency room who had been beaten

4

and shot in the leg. The female was identified as M.Z. Det. Adney went to Stillwater Medical Center (SMC) and made contact with Stillwater Police Officer's Howell and Rivera. Officer Howell stated M.Z. had been beaten resulting in large contusions on her head, multiple lacerations about her head and face, a stab wound on her right shoulder, and a single gunshot wound to her left leg.

9.      M.Z. had driven herself to SMC at approximately 1800 hours. Officer Howell stated he found M.Z.'s vehicle in the SMC parking lot. The car was a gold, 1999 Mazda 626 with Iowa state tag NNM907. Officer Howell looked through the window and observed minimal blood in the passenger seat along with a used first aid kit in the floorboard.

10.      Det. Adney introduced himself to M.Z. and began his investigation. Det. Adney documented injuries with photos and his body worn camera (BWC) throughout their interaction. Det. Adney observed a significant amount of dried blood on M.Z.'s face. M.Z. had a cut over her left eye and left side of her head. A large contusion approximately the size of an egg was on the left side of her head above her ear. She had a cut on her right cheek which was swollen along with her right eye. There was a stab wound approximately one inch wide on her ride shoulder by her clavicle. There were scratches on her back and a large contusion about the size of an orange on the back of her head. There was a single gunshot wound on her left thigh. A small circular hole was on the underside of M.Z's thigh near the outside of her left leg. A large hole approximately 2" by 2" was in the front of her thigh approximately 6" above her knee.

11.      Det. Adney asked M.Z. if she would allow the SPD to search her vehicle and she agreed. Det. Adney read the "Consent to Search" form to M.Z. and she signed the form. Officer Howell assisted Det. Adney with the search of the vehicle and the collection of evidence. Det. Adney photographed the vehicle from the exterior to the interior. The only blood found in the

5

vehicle was in the passenger seat where the left leg of M.Z. would have been if she was sitting there. The passenger floorboard had some bloody gauze bandages, empty gauze packaging, and a first aid kit. There was a roll of medical tape between the passenger seat and the car door. Det. Adney collected the following items as evidence:

> In the passenger door panel: triangle bandage, medical scissors, disinfectant cleaning wipe wrapper, and bloody gauze with wrapper.

> On the passenger floorboard: used first aid kit, sterile gauze pad box, empty gauze wrappers, and pair of pink socks with blood drops.

12.     Det. Adney also interviewed M.Z. and was told that she was assaulted and shot at a Neighborhood Walmart in Stillwater, Oklahoma. M.Z. gave many details about the assault, and stated she did not know who the assailant was. Based on this interview, SPD officers went to the referenced Walmart and reviewed video footage from the Walmart. However, they found no evidence supporting M.Z.'s story of being assaulted outside a Walmart.

13.     At approximately 1000 hours on October 28, 2023, Det. Adney went to the residence of C.Z., mother of M.Z. Upon arrival Adney spoke with C.Z. and was introduced to J.M., the father of M.Z.'s children. J.M. stated he would like to speak with Det. Adney when he was done speaking with C.Z. because he had pertinent information to share.

14.     C.Z. said M.Z. had a boyfriend named Justin (Brown). C.Z. believed Brown had been the one who shot M.Z. C.Z. said Brown was violent and had beaten M.Z. up multiple times. C.Z. said there was previously an incident in Bethany, Missouri where Brown pulled a gun on M.Z. C.Z. did not know any information about Brown other than he was an Otoe-Missouria Tribal member and lived on tribal land by Red Rock, Oklahoma.

15.     Det. Adney next spoke with J.M. who provided a full name for M.Z.'s boyfriend,

6

Justin Randall Brown. J.M. was aware of several incidents of abuse by Brown against M.Z.. J.M. advised he had received text messages from M.Z. after Brown had beaten her and even raped her with a gun barrel. J.M. also mentioned the incident in Bethany Missouri. J.M. said Brown had threatened to hurt his and M.Z.'s children as well. J.M. believed M.Z. had been beaten and shot at Brown's house.

16.     At approximately 1600 hours on October 28, 2023, M.Z. was interviewed by Det. Adney at the Stillwater Police Department. The entire interview was recorded. M.Z. confirmed Brown was the person who had assaulted her.

17.     FBI Special Agent Timothy Doyle met with and interviewed M.Z. at the FBI Office in Stillwater, Oklahoma on November 20, 2023.

18.     M.Z. met Brown through her cousin I.A. Brown had known several members of M.Z.'s family for a while. By New Year's Day of 2023 M.Z. and Brown were in a committed relationship. Early in their relationship Brown mentioned to M.Z. that she should look up his past but M.Z. never did.

19.     Within just a few days of the two of them being in a full-time relationship M.Z. was already having bad feelings about Brown but she also felt that it was nice to be with someone, so she ignored the feelings.

20.     From January until March of 2023 they were together almost every day. About March 20, 2023, M.Z. and her two minor sons moved out to Brown's property located at 14680 County Road 170, Red Rock, Oklahoma. M.Z. described the property as two small sheds. One had the kitchen area and the other was a bedroom with a loft area.

21.     At some point in the first few months of dating, M.Z. and Brown were driving to Riverside Casino in Tulsa and Brown began talking about the murders of some women in Tulsa.

M.Z. was uncomfortable by that conversation and remembers feeling at that time that he may end up being the death of her.

22.     Around April 28, 2023, M.Z. and Brown were staying in Winterset, Iowa with C.M.. M.Z.'s sons were both staying in Stillwater at M.Z.'s mother's home during this time. They had gone to stay with C.M. because M.Z.'s father lives in Iowa and had been put on Hospice Care.

23.     M.Z. borrowed a GMC truck from C.M. to go get alcohol but Brown became upset and thought M.Z. was trying to leave him in Iowa, so he jumped up and decided to go with M.Z.. Brown was upset and drove around aimlessly for a couple of hours before finally making it to Interstate 35 and driving south back towards Oklahoma. Shortly after getting into Missouri, Brown stopped at a rest stop. They both slept for a short while and then M.Z. woke up and began driving the truck. M.Z. drove to the next turnaround area on the interstate and started going back north. Brown woke up while M.Z. was driving and began beating her and throwing her belongings out of the truck. Brown also pointed a gun at M.Z.'s head while she was driving. M.Z. ended up pulling onto an exit ramp near Bethany, Missouri.

24.     M.Z. described the gun as a 9mm, black in color, with a square shaped barrel. M.Z. knew the gun was a 9mm because Brown had let her and her son's shoot it before and she had bought ammunition for him. M.Z. remembered having purchased ammunition at Atwoods in Stillwater and specifically recalled Brown asking for hollow point ammunition. Brown had also told M.Z. he had been to prison and wasn't supposed to own a gun.

25.     Brown began driving again after they pulled over. M.Z. began yanking on the wheel and honking the horn because she had been told by C.M. that C.M. had reported the truck as stolen. Eventually Brown stopped so M.Z. jumped out of the truck and began walking down the road and into and out of traffic. Brown drove off and left her.

8

26.     M.Z. was eventually picked up my Missouri State Police. They drove her to a hotel. M.Z. later learned Brown drove to an area near Kansas City before finally running out of gas and then calling his mother to come pick him up.

27.     Prior to the trip to Iowa, Brown had threatened M.Z. with the gun on multiple occasions. Once while they were at his property, they were arguing about the TV show "Handmaid's Tale" and Brown put the loaded gun into her vagina. Another time Brown hit M.Z. in the head with the gun and then unloaded it and put it in her vagina. M.Z. remembers thinking to herself "at least he unloaded it this time" when he did it. She said this happened after her kids had left for school. During the incident Brown told M.Z. he didn't want to live without her. After the incident she contacted White Eagle Transport, and they came to pick her up and drove her to go get groceries. After she returned from the store Brown apologized to her.

28.     Often Brown would threaten someone was going to take her sons away from her or he would threaten to kill both of them. Brown would tell M.Z. he would make sure to kill one of her sons first since Brown believed this son was her favorite, but he would kill the other as well.

29.     During one argument around the end of March of 2023, Brown shot a bullet past M.Z.'s head while she was on the bed. The bullet went through the wall and out of the building. M.Z. said every time she went outside, she could see the hole in the outside of the shed. After Brown shot that bullet at her he was out of ammunition and was pointing the gun up to the loft area where one of her sons was sleeping. They continued arguing and Brown pulled the trigger again while the gun was pointed to the area her son was sleeping.

30.     Around, or shortly after, October 9, 2023, M.Z. and her two sons went to live at Wings of Hope in Stillwater.

31.     On or about October 27, 2023, M.Z. had been missing Brown and they seemed to

9

have been on good terms so M.Z. went to visit him at his property. The two of them had sex and were laying together just hanging out for a while. M.Z. told Brown that one of her sons had a school parade so she needed to leave to go to that. Brown became very upset and began abusing and threatening her at that time. Brown had a Kukri (similar to a machete) and was beating M.Z. on the head with it. Brown also was threatening to kill all her friends and family. Brown claimed to be part of the Indian Brotherhood and also told her he was on federal land, so he could do whatever he wanted, and she couldn't do anything about it.

32.     At some point M.Z. was squatting on the bed while they were arguing, and Brown was standing in front of her. M.Z. remembers Brown looked her right in the eyes and pointed the gun at her thigh and shot her. After he shot M.Z., she put her head against the barrel of the gun and told him to shoot her again and kill her quickly. Brown told M.Z. he had already dug a hole for her body on the property. Brown also told M.Z. he killed a woman (possibly named Mary) and buried her on the property and said he had killed a man and buried him under the tiny house (shed) they were in.

33.     The abuse and arguing continued until Brown said he needed cigarettes. Both of them got into her car and drove to the gas station. M.Z. had a first aid kit in her car so she began treating her wounds in the car. She recalled thinking he may be taking her somewhere to finish her or dump her, so she kept throwing the bloody gauze out of the window to leave evidence on the roadway.

34.     After going to the gas station, they returned to Brown's property and Brown held M.Z. until he fell asleep. Brown had taken the car keys and had them in his pocket and Brown had also taken M.Z.'s glasses but M.Z. had no idea where they were at.

35.     Brown was holding M.Z. tight and she was getting a headache and feeling like she

10

was going to throw up. Brown finally gave M.Z. the car keys so she left and drove herself straight to Stillwater Medical Center Emergency Room. M.Z. was initially treated at Stillwater Medical and then transferred to OU Medical.

36.     After this incident, Brown and M.Z. have had no contact, although M.Z. did send Brown some messages on Facebook Messenger. M.Z. said Brown never replied to any of those messages and does not believe he reviewed them.

37.     The DEVICE is currently in the possession of law enforcement, specifically the possession of the Kay County Detention Center.  On November 3, 2023, Brown was arrested for violating Oteo-Missouria Criminal Code by assaulting M.Z.  During his arrest he was taken to Kay County Detention Center where his personal belongings on his person including the DEVICE were placed into a property bag under his name in the Kay County Detention Center.  In my training and experience, I know that the DEVICE has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the DEVICE first came into the possession of Kay County Detention Center.

38.     On November 6, 2023, Otoe-Missouria Police Department served a search warrant at 14680 CR 170, Perry OK. Upon service of the warrant, Brown was located at the premises and arrested on an outstanding warrant. Also located during the search warrant execution was a 9mm Hi-Point pistol, a pistol holster, a machete with green and black handle, multiple spent casings, some 9mm bullets, and bed linens with reddish brown stains believed to be blood.

39.     The same day, Brown was *Mirandized* and stated he wanted to talk to an attorney, so no interview occurred.

40.     On November 7, 2023, Brown makes a jail call to a person believed to be his mother. During the call, the mother tells Brown that she is going to take responsibility for whatever

11

happened to M.Z.

41.     On December 4, 2023, M.Z. was again interviewed by SA Doyle.  During the interview she stated that while she was assaulted on October 27, 2023, the DEVICE was present in the room.

42.     M.Z. stated that Brown was the owner of the gun that she shot him with.  She said she had seen it on several occasions and that Brown had taught her how to use it.  She said that she had shot the gun on Brown's property with her boys several times, recalling that they would shoot at a refrigerator/freezer.  M.Z. said she had bought ammunition for the gun.

43.     M.Z. stated she and Brown had been in a committed romantic relationship since around December 2022 until October 27, 2023.  M.Z. stated that she had lived at Brown's residence with him, and sometimes her children, for the majority of 2023.  She stated that Brown had recorded them engaging in sexual activities on the DEVICE on at least one occasion and other images of them together would likely be on the DEVICE.

44.     M.Z. stated that she would communicate to Brown using Facebook Messenger prior to and after the assault.

45.     On December 4, 2023, a Criminal Complaint was filed against Brown alleging the same violations described in this affidavit except for kidnapping.  *See* Case No. M-23-980-SM. An arrest warrant was issued based on the criminal complaint. *Id.*

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

46.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, items that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensic tools.

12

47.     As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the DEVICE was used, the purpose of its uses, who used it, where it used them, and when.   There is probable cause to believe that this forensic electronic evidence might be on the DEVICE because:

    a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).   Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.   Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.   Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.   Computer file systems can record information about the dates files were created and the sequence in which they were created.

    b.   Forensic evidence on a device can also indicate who has used or controlled the device.   This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c.   A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw

13

conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, it is sometimes necessary to establish that a particular thing is not present on a storage medium.

f.  I know that an electronic device can be an instrumentality of the crime and also can be a storage medium for evidence of the crime.

g.  From my training and experience, I believe the data on the DEVICE will contain evidence that Brown and M.Z. were in an intimate partner or dating relationship in the form of images, videos, texts, Facebook Messenger messages, and other communications showing them together.

h.  From my training and experience, I believe the data on the DEVICE will contain GPS data placing Brown at the location of the October 27, 2023, assaults, and other violations, including the drive to the gas station.

14

    i.    From my training and experience, I believe the data on the DEVICE will contain images or videos of the firearm and the Kukri used in the assault as people who possess firearms and other weapons often take pictures of their firearms or other weapons that they own.

    j.    From my training and experience, I believe the data on the DEVICE will contain images or videos showing that Brown lived at the residence where the firearm was discovered and seized and where the assault and other violations occurred.

48.    From my training and experience, I believe the data on the DEVICE will contain images or videos showing that the suitcase the firearm was found in was Brown's suitcase. In addition to any electronic evidence described above, I am seeking authority to search for any items detailed in Attachment B.

49.    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant your Affiant is applying for would permit the examination of the DEVICE consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

50.    Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, your Affiant submits there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

51.    Based on all the above-listed facts and circumstances, your Affiant believes that probable cause exists for a search warrant authorizing the seizure and examination of the DEVICE

described in Attachment A to seek the items described in Attachment B, which will constitute evidence and instrumentalities concerning violations of Assault and Battery with a Dangerous Weapon, in violation of 18 U.S.C. §§ 113(a)(3) and 1153(a), Assault Resulting in Serious Bodily Injury, in violation of 18 U.S.C. §§ 113(a)(6) and 1153(a), Assault of a Spouse, Intimate Partner, or Dating Partner Resulting in Substantial Bodily Injury, in violation of 18 U.S.C. §§ 113(a)(7) and 1153(a); Kidnapping, a violation of 18 U.S.C. §§ 1201(a) and 1153(a); and Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1).

52.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States… that - has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

53.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

Timothy Curtis Doyle
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on this 8th day of December, 2023

SUZANNE MITCHELL
UNITED STATES MAGISTRATE JUDGE

16

## ATTACHMENT A

### Property to Be Searched

This warrant applies to the Samsung, black in color, mobile phone with IMEI 354356401632052 on the back of the phone ("the DEVICE"), inside of a gray and lime green case, currently in the possession of law enforcement, specifically in inmate Justin Randall Brown's property bag in the Kay County Detention Center located at 1101 W Dry Rd., Newkirk, Oklahoma, 74647.

This warrant authorizes the forensic examination of the DEVICE for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

### Particular Things to be Seized

1. All records on the extraction of the DEVICE described in Attachment A that relate to the offenses of Assault and Battery with a Dangerous Weapon, in violation of 18 U.S.C. §§ 113(a)(3) and 1153(a), Assault Resulting in Serious Bodily Injury, in violation of 18 U.S.C. §§ 113(a)(6) and 1153(a), Assault of a Spouse, Intimate Partner, or Dating Partner Resulting in Substantial Bodily Injury, in violation of 18 U.S.C. §§ 113(a)(7) and 1153(a); Kidnapping, a violation of 18 U.S.C. §§ 1201(a) and 1153(a); and Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1), including:

    a. Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show address book information, including all stored or saved telephone numbers.

    b. Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from the DEVICE and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls.

    c. Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device.

2

d.  Audio recordings, pictures, video recordings or still captured images on phone memory cards, or other storage related to the planning, coordinating, motive, and or executing activities in furtherance of violations listed above..

e.  Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations.

f.  Evidence of who used, owned, or controlled the DEVICE at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence.

g.  Evidence of the presence or absence of software that would allow others to control the DEVICE, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software.

h.  Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the DEVICE.

i.  Evidence of the times the DEVICE was used.

j.  Passwords, encryption keys, and other access devices that may be necessary to access the DEVICE.

k.  Applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the DEVICE or to conduct a forensic examination of it.

l.  Evidence indicating how and when the account for the DEVICE was accessed or used, to determine the chronological and geographic context of account access, use and events relating to the crime under investigation and the account subscriber.

m.  Evidence indicating the subscriber's state of mind as it relates to the crime under investigation.

n.  Evidence that may identify any co-conspirators or aiders and abettors.

II.  As used above, the terms "records" and "information" include all the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

III.  This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.